UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-CV-10989-RGS

BORIS MOGILEVSKY

v.

WELLBRIDGE CLUB MANAGEMENT, INC.

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

November 28, 2012

STEARNS, D.J.

Plaintiff Boris Mogilevsky brought this two-count Complaint against his former employer, Wellbridge Club Management, Inc. (Wellbridge), a health club where Mogilevsky worked as a personal trainer, alleging retaliation for his having brought a class-action complaint on behalf of himself and other similarly-situated employees involving unpaid wages (Wage Act litigation). Mogilevsky claims that after he began the Wage Act litigation, Wellbridge directed less business to him, unfairly criticized his job performance, lodged baseless disciplinary complaints, terminated his employment, and then supplied derogatory information to prospective new employers. The Complaint alleges violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 215(a)(3), and the anti-retaliation provision of the Massachusetts Wage Act, Mass.

Gen. Laws ch. 149, § 148A.  Wellbridge now seeks summary judgment arguing that Mogilevsky has failed to proffer any evidence that links the Wage Act litigation to any allegedly "adverse" employment  action.  Moreover, Wellbridge contends that  by operation of the doctrine of res judicata (claim preclusion), the judgment in the underlying Wage Act litigation precludes Mogilevsky from bringing the bulk of his "new" claims.  A hearing on the motion for summary judgment was held on November 20, 2012.

## BACKGROUND

Wellbridge employed Mogilevsky as a personal trainer at its fitness club in Cambridge, Massachusetts (the Club) from July of 2002 until his termination on June 28, 2010.  Mogilevsky's job duties consisted of providing individualized personal training to Wellbridge clients (in compliance with Wellbridge's Personal Training Standards); conducting initial consultation sessions for new clients; and meeting the revenue and performance goals set by his managers.[1]  Mogilevsky's direct supervisor was Personal Training Manager Eric Abella, but he also answered to the Director of Human Resources (HR), as well as the Club's General Manager (GM).  According to HR Director Terri Hebdon, Mogilevsky was a "challenging" employee who at times

---

[1] During his employment at Wellbridge, Mogilevsky's title was elevated to that of "elite" personal trainer, which entailed an increase in salary, but no fundamental change in job description.

was "rude and abrasive" in his dealings with his managers.  Hebdon Dep. at 58-59.

Melissa Murphy, who began working at the Club in June of 2007, and became GM in

June of 2009, testified that "keeping Boris happy" ranked second in the stresses of her

job only to answering complaints about the Club's membership cancellation policy.

*See* Murphy Dep. at 7,10, 41-42.  Murphy described Mogilevsky as "an argument

starter."  *Id.* at 86-87.  But she also testified that "his clients love[] him." *Id.* at 89.

The Wage Act Litigation

On May 17, 2007, Mogilevsky brought a class action lawsuit against Wellbridge

under the FLSA and the Wage Act claiming that trainers were not being paid overtime

wages for work in excess of forty hours per week.  Wellbridge responded that under

its established policies trainers were paid a commission when providing personal

training services and hourly wages only when performing "noncommissionable" work.

"Wellbridge has discovered that, notwithstanding its instructions, a substantial number

of personal trainers, including Plaintiff Mogilevsky and other Putative Class Members,

have punched into the timekeeping system and thereby caused Wellbridge to

compensate them erroneously at an hourly wage for time spent performing personal

training sessions." *Mogilevsky v. Wellbridge Club Mgmt., Inc*., 07-10942-RGS - Dkt

#34 - Countercl. ¶ 5.  Based on what it characterized as an improper "pyramiding" of

commissions and hourly compensation, Wellbridge brought  counterclaims against the

3

class members for breach of contract, unjust enrichment, and fraud. *Id.* Countercl. ¶ 9. In June of 2008, Mogilevsky moved for summary judgment on the class claims. Wellbridge acceded to liability and sought the appointment of a special master to determine the award of damages. This court allowed Wellbridge's motion, entered judgment on liability only, and referred the case to Magistrate Judge Dein "to address all issues of remedy." *Id.* Dkt #22.

On December 2, 2008, while the case was pending before Magistrate Judge Dein, Mogilevsky moved to amend the Complaint to add a retaliation claim based on Wellbridge's counterclaims against the class members, arguing that the allegations of fraud violated the unlawful retaliation provisions of the FLSA and the Wage Act. Magistrate Judge Dein allowed the amendment. However, before the matter was resolved, on June 15, 2009, Mogilevsky accepted an Offer of Judgment from Wellbridge on behalf of the class, and filed a Satisfaction of Judgment, which included the attorneys' fees and costs incurred by class counsel. Mogilevsky now asserts that in the wake of the settlement, Wellbridge set out to exact revenge by shunting away potential clients (thereby reducing his income), assembling a dossier of unwarranted disciplinary actions, and then using the dossier to fire him.

Warnings and Disciplinary Actions

On April 22, 2004, Mogilevsky was issued a warning for his failure to "timely

execute[ ] [a] fitness appointment on April 7, 2004." Pl. Ex. 14.  He was cautioned that the failure to appear for a scheduled session "without notice is unacceptable and [would] not be tolerated." *Id.*  On December 20, 2004, Mogilevsky received a written warning for personally working out on the Club's fitness floor during his shift hours. *See* Def. Ex. G.

Matters appear to have remained calm until December of 2007, when Ilyse Mehlman, a Club member, complained that Mogilevsky repeatedly remarked during her training sessions that her body type was "typical of Jewish women" and that it was "common for Jewish females to store body fat on the thighs."  Def. Ex. L. While Mehlman in a letter to Abella stated that she "hoped [Mogilevsky] meant no harm," she expected to be "getting a physical training session" and not "a session on eugenics and racial stereotyping."  *Id.* Mehlman complained that her training with Mogilevsky left her "disgusted, defeated and, demoralized . . . and if things did not improve [she] will not only withdraw [her] membership . . . but [would] not hesitate to pursue other forms of complaint."  *Id.*  When Abella confronted Mogilevsky with Mehlman's complaint, he denied any stereotyping of "Jewish" women,[2] although he conceded that his remarks to Mehlman were "not acceptable."   Mogilevsky Dep. at 129; Abella Dep. at 126.

In January of 2008, Abella verbally counseled Mogilevsky about his failure to

---

[2] Mogilevsky himself is Jewish.  Hebdon Dep. at 91.

clock in and out for his scheduled floor shifts. Mogilevsky Dep. at 133-134. Mogilevsky was issued a Performance Improvement Plan (PIP) stating that "[n]umerous performance issues have been addressed with Boris Mogilevsky previously, but they continue to arise and thus need to be addressed in a more formal manner. These issues concern Boris's persistent unwillingness to adhere to Wellbridge standards and policies . . . ." Pl. Ex. 13 - Dkt #25-4. Mogilevsky denies that he was ever given the PIP. Mogilevsky Dep. at 132-134.

In February of 2008, Abella witnessed a verbal altercation between Mogilevsky and a co-worker, Vanessa Cadoux, in a public area of the Club during which he thought he heard Mogilevsky call Cadoux a "bitch." Abella Dep. at 148-149, 150-152. Abella warned Mogilevsky that his conduct and language were inappropriate. *Id.* at 149-150. Abella testified that this was the third occasion on which he had reprimanded Mogilevsky for using derogatory terms in speaking with female employees. *Id.* at 153-156. Abella issued PIPs to Mogilevsky and Cadoux. Mogilevsky's PIP stated that "[i]f a confrontational situation arises, Boris must refrain from escalating the situation and get management involved." Pl. Ex. 14 - Dkt #25-5. Abella testified that he would not have taken disciplinary action but for Mogilevsky's use of the term "bitch."[3]

---

[3] Mogilevsky denies having used the precise term or, if he did, that he did not intend it in its derogatory sense. Pl. SOF ¶ 24.

A Wellbridge company rule permitted non-members to train onsite for a maximum of thirty days before purchasing a Club membership. Mogilevsky objected to the rule and in 2009, when his non-member client, Clementine Knight, was turned away from the Club for a training session, Mogilevsky brought her into the office of manager Mike Rowley and demanded that he explain the policy to her. On May 6, 2009, Mogilevsky received a written warning for insubordination because of the incident. Mogilevsky claimed that he was adhering to the directive in his PIP to "get management involved." He also contends that Wellbridge failed to apply the policy to clients of its other Cambridge trainers.

On June 15, 2009, Melissa Murphy complained to Hebdon that Mogilevsky had told her that she "should be more careful" about her eating choices because, in her new position as GM, she was "going to gain weight." *Id*. at 101; Mogilevsky Dep. at 151. Murphy cautioned Mogilevsky that he should not discuss or critique the eating habits of his co-workers. Notwithstanding, on February 5, 2010, Meredith McSorley, a Wellbridge employee, complained to Murphy that Mogilevsky had called her a "little piggy" and had accused of being "greedy" in her eating habits. According to Murphy, Mogilevsky knew that McSorley was battling anorexia. McSorley told Murphy that Mogilevsky's comments had caused her "a great deal of anxiety." Murphy Dep. at 69, 118-119. Mogilevsky maintains that his comments to Murphy were no different in

7

degree than those in an email Abella had circulated to the trainers in which he had said that his "door is always open (unless Vanessa [Cadoux] is complaining about being hungry and needs to be fed)." Pl. Ex. 37. Mogilevsky concludes that Wellbridge tolerated "teasing" by others, but singled him out for discipline. *See* Hebdon Dep. 122-123.

In early February of 2010, Lauren Summers, a Wellbridge fitness instructor, complained to Murphy that on several occasions Mogilevsky had positioned himself outside of her Zumba class mimicking the participants' movements. While she stated that Mogilevsky did so "in a playful way," he would linger "too long," causing her students to complain that his behavior felt "creepy." Def. SOF 42; Def. Ex. P. When Murphy spoke to Mogilevsky, he stated that he was simply waving to his clients in the class and that "everybody can watch" because the class was held "in a studio with [a] huge window." Mogilevsky Dep. at 154.

On March 3, 2010, Mogilevsky was issued a PIP based on Summers' complaint. The PIP cited his "counterproductive behavior." Def. Ex. Q. It informed Mogilevsky that his actions "could be interpreted as offensive and/or in violation of the Company's policy against harassment." *Id*. Mogilevsky was told to "immediately increase his level of professionalism with members and co-workers," "immediately refrain from engaging in personal, offensive or degrading communication to other individuals within

Wellbridge," "treat the other staff and members in a professional and courteous manner," and "not attempt to conduct nor discuss his behavior with individuals he believes might have had issues with his behavior." *Id.* The PIP further stated that this was a "final written warning." *Id.*

According to Wellbridge, two final incidents involving Mogilevsky led to Murphy's decision to terminate him. In the Spring of 2010, two newly enlisted Club members expressed an interest in personal training sessions. Murphy booked new member Arturo Alvarado with Mogilevsky.[4] After one training, Alvarado opted not to purchase additional sessions. Mogilevsky then accused Murphy of lying to him about Alvarado's interest in pursuing personal training. Murphy Dep. at 160-161. Murphy later saw Mogilevsky approach Alvarado on the Club's fitness floor. Mogilevsky brought Alvarado into Murphy's office and demanded that he admit that he had never intended to purchase trainings. In Murphy's view, Alvarado was taken aback and appeared "very uncomfortable." *Id.* Murphy later reprimanded Mogilevsky for involving Alvarado and causing him distress.

The second incident involved Jack Alexandre, a Club member who had rescheduled a training session to another time with another trainer. Mogilevsky made

---

[4] Wellbridge offered a complimentary personal training session to newly enrolled members to encourage their future patronage of the personal trainers.

several telephone calls to Alexandre demanding to know why he had cancelled the appointment.  Alexandre complained to Abella about the succession of Mogilevsky's calls and his attitude over the telephone.  Hebdon Dep. at 64; Murphy Dep. at 168-169; Abella Dep. at 231.  Alexandre insisted that Mogilevsky be forbidden from further contact and that he be assigned to another trainer.  *Id.;* Murphy Dep. at 168-169.[5] Murphy, in consultation with Abella and Hebdon, terminated Mogilevsky in June of 2010.[6]  Hebdon Dep. at 61; Murphy Dep. at 173; Abella Dep. at 231-232.

Performance Reviews

Wellbridge performance reviews use the following grading system:  4 points - "consistently exceeds standard expectations"; 3 points - "frequently exceeds standard expectations"; 2 points - "regularly meets or occasionally exceeds standard expectations"; 1 point - "occasionally meet expectations but frequently perform below standard"; 0 point - "rarely performs at accepted standard, improvement essential." Employees are graded on "job performance"; "job skills"; "service and attitude"; "work habits"; and "job development."   Mogilevsky's November 20, 2006

---

[5] According to Mogilevsky, he called Alexandre twice at Alexandre's request. Pl. SOF ¶ 113.

[6] Murphy testified that during her two years as the Club's GM, she reprimanded many employees and terminated three, among them Mogilevsky.  Murphy Dep. at 53, 70-73.

performance review reflected a total overall score of 1.95; his performance review for November 14, 2007, an overall score of 2.15; and his December 12, 2009 performance review combined score was 2.1.  *See* Def. Ex. O.  Mogilevsky notes that in his 2006 review, his manager recorded "Exceeds Expectations" in assessing whether he "[w]orks well with other associates," stating that he "[g]ets along well with co-workers." His 2007 review concluded in the "overall performance summary" that "[h]e is able to work well with others and is a very dependable employee."  *Id*. Mogilevsky's December 12, 2009 review – completed six months before his termination – noted that he was "very well respected by staff and members, but especially by his clients."  *Id.*  In attempting to explain the incongruity between her negative personal assessment and Mogilevsky's performance reviews, Murphy testified that Abella (who did the grading) "felt that it was easier to placate Boris than criticize him on a form . . . ." Murphy Dep. at 121.   Abella, however, in his deposition stood by his 2006, 2007, and 2009 evaluations of Mogilevsky as "true and accurate."  *Id*. at 119-120, 121, 208-209.

Wellbridge maintained an Associate Handbook (a copy of which Mogilevsky acknowledges having received) setting out performance expectations of its employees. The Associate Handbook provides:

Member and Guest Relations

Wellbridge is committed to setting the standard of customer service within the health and fitness industry. Recognizing the needs of members, guests and co-workers is of the utmost important and providing outstanding customer service is critical to Wellbridge's continued growth and success. You are part of the team because you share the Wellbridge philosophy of providing superior customer service and will assist with making company goals a reality.

*     *     *

Create a positive experience for Wellbridge members each and every time they visit a club! Create a sense of belonging, loyalty and comfort for Wellbridge members. Consistent positive experiences are what will create a long lasting relationship with Wellbridge. If confronted with a situation concerning a member or guest that you feel you cannot satisfactorily handle, please ask the customer to wait for you to contact your supervisor, Manager on Duty, or General Manager for assistance. In all instances, it is essential that you display a professional demeanor and communicate with all members, guests, and co-workers in a courteous, friendly and helpful manner.

Wellbridge Ex. B.

DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990). In an employment discrimination case, the plaintiff "cannot rely exclusively on bald assertions, unsupported conclusions, or optimistic surmises. . . . Where, as here, the nonmovant-plaintiff has the burden of

proof, the evidence adduced on each of the elements of his asserted cause of action must be significantly probative in order to forestall summary judgment." *Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007). "[C]onjecture cannot take the place of proof in the summary judgment calculus." *Id.* at 31. Rule 56 "mandates the entry of summary judgment . . . upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Notwithstanding, the First Circuit has cautioned that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). However, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

The FLSA prohibits covered employers from retaliating against an employee who has "filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). To succeed on his claim of FLSA retaliation, Mogilevsky must prove: (1) that he "engaged in statutorily protected

activity"; (2) that Wellbridge afterward took an "adverse employment action" against him; (3) "as a reprisal for having engaged in the protected activity." *Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004).   If there is no direct evidence of a defendant's retaliatory animus (as is the case here[7]), "the *McDonnell Douglas* burden-shifting framework is used to allocate and order the burdens of producing evidence." *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973) burden shifting to a Title VII retaliation claim).   "Once a prima facie showing has been made, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision." *Fennell*, 83 F.3d at 535; *Bishop v. Bell Atl. Corp* ., 299 F.3d 53, 58 (1st Cir. 2002).   If the defendant makes the requisite showing, "the ultimate burden falls on the plaintiff to show that the proffered

---

[7] Mogilevsky argues that the judgment entered in the 2007 lawsuit (in June of 2009) precludes Wellbridge from denying that it had retaliated against him.  It is true that Magistrate Judge Dein permitted Mogilevsky on behalf of the class to amend the Complaint to add a retaliation claim.  However, the retaliation claim was generic to the plaintiffs as a class, the theory being that Wellbridge had retaliated against the class members by bringing breach of contract claims against only those employees who had opted into the Wage Act litigation.  As the case settled without the entry of a final judgment specifying liability, the settlement has no res judicata effect for offensive use purposes.  *See generally Apparel Art Int'l, Inc. v. Amertex Enters. Ltd.*, 48 F.3d 576, 583-584 (1st Cir. 1995).  Wellbridge's argument for the defensive use of the res judicata effect of the 2009 settlement is based on a similar mistaken assumption.

legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.*

Mogilevsky raises three allegedly adverse employment actions that merit discussion.[8] First, after he brought the FSLA lawsuit in 2007, Mogilevsky alleges that Wellbridge sent him fewer bookings of personal training sessions, which reduced his income. Second, he claims that beginning in 2007, he became the target of "unwarranted disciplinary actions" by Wellbridge involving conduct allegedly "offending" co-workers and clients, an issue that had never arisen prior to the lawsuit. And third, of course, was his termination in June of 2010, a year after the lawsuit settled.

In support of the claim that Wellbridge purposefully "starved him of clients", Mogilevsky charts a progressive decline in his personal training sessions as a percentage of the total conducted at the Club - 25% of the total sessions in 2007; 21% in 2008; 15.5% in 2009; and 14.2% (pro-rated) in 2010. According to Mogilevsky, the steady diminishment of his total of the bookings demonstrates that "clients were being

---

[8] Mogilevsky also alleges that Wellbridge gave negative references to his prospective employers. This claim is based on Mogilevsky's assertion that after several job interviews at which he had invited prospective employers to call Wellbridge regarding the circumstances of his termination, he was not offered a job, when he was "sure [he] was going to be . . . hired." Mogilevsky Dep. at 118-119. The invited inference that he was not hired by these unnamed employers because Wellbridge provided them with unflattering information is too weak to sustain the allegation.

diverted away from him and towards other trainers, resulting in [his] financial harm."
Pl. Opp'n at 19.  Wellbridge responds that over the same time period, other of its
trainers experienced a similar decline in business, as did the facility as a whole.  Abella
testified that he determined from a review of Club records that Mogilevsky had
remained consistently among the top three trainers in referral totals.[9]  Abella Dep. at
222-223.  Murphy also testified that during the contested time period, several additional
trainers had been hired with skill sets that may have had greater appeal to the Club's
clientele.[10]  *See* Murphy Decl. ¶ 5.  As the argument over this issue is pretty evenly
divided, the tie breaker goes to Mogilevsky as the nonmoving party.

As there is no dispute that termination is the gold standard of an adverse
employment action, and no real dispute but that Wellbridge has met its very light
burden of proffering a non-retaliatory explanation for its firing of Mogilevsky, the focus

---

[9] More compelling, according to Wellbridge's Interrogatory Answer No. 2 (Pl.
Second Set of Int.s), Mogilevsky received total compensation of $90,452.01 in 2007;
$95,932.42 in 2008; and $104,764.44 in 2009.  Mogilevsky was terminated in June of
2010.

[10] Murphy acknowledges that in early 2010, she discovered that over a two-week
period, Sales Representative Erica Madore had purposely refused to refer new
members to Mogilevsky for introductory training sessions because she was upset at the
way he treated her.  When Murphy learned of Madore's actions, she reprimanded her
and instructed her to resume regularly scheduling Mogilevsky for training sessions.
Mogilevsky notes that Wellbridge never instituted a formal disciplinary action against
Madore.

is on the third of the *McDonnell Douglas* elements – whether there is "evidence from which a reasonable fact finder could infer that [Wellbridge] retaliated against [Mogilevsky] for engaging in the protected activity." *Blackie v. State of Me.*, 75 F.3d 716, 723 (1st Cir. 1996). To establish the necessary causal connection, Mogilevsky must produce evidence that tends to show that the filing of the 2007 lawsuit was the "but for" cause of his termination. *See Kearney v. Town of Wareham*, 316 F.3d 18, 23 (1st Cir. 2002). "It is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [retaliation].'" *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991), quoting *Medina-Muñoz*, 896 F.2d at 9.

While direct evidence of retaliation is rare, the court recognizes several categories of circumstantial evidence bearing on the possibility of pretext. "[T]emporal proximity of an employee's protected activity to an employer's adverse action" may support an inference of retaliation. *Mesnick.*, 950 F.2d at 828; *see also Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir. 1988) (discharge soon after protected conduct is strongly suggestive of retaliation). While Wellbridge argues that Mogilevsky was terminated more than three years after he filed the FSLA lawsuit on May 17, 2007, for obvious reasons, a fairer measure of time is from the date the lawsuit

was settled on June 15, 2009.  The span of a year is at the outer limit of what the cases

have found to support a temporal inference where it is the plaintiff's only evidence.

*See, e.g.*, *Bishop*, 299 F.3d at 60 (if temporal proximity is the only evidence

establishing retaliation, the proximity must be "very close" – one-year gap between

protected activity and adverse action is insufficient), quoting *Clark County Sch. Dist.*

*v. Breeden*, 532 U.S. 268, 273 (2001) (finding twenty months too long where relying

exclusively on temporal proximity); *Mesnick*, 950 F.2d at 828 (same – nine months

inadequate); *Bennett*, 507 F.3d at 32 (sixteen months with intervening positive

evaluation cannot support causal connection).  However, Mogilevsky does not rely

exclusively on a temporal connection; he argues that Wellbridge's "'pattern of

antagonism' following the protected conduct . . . gives rise to the inference' that a

causal connection exists."  *Che v. Massachusetts Bay Transp. Auth.,* 342 F.3d 31, 38

(1st Cir. 2003), quoting  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d

Cir. 1997).  Mogilevsky also points to evidence of Wellbridge's "disparate treatment"

of him as compared to other trainers "who engaged in similar conduct . . . ." *Che*, 342

F.3d at 38, citing *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.

1990) (permitting plaintiffs to establish "[t]he causal connection between the protected

activity and the adverse employment action . . . by showing that the protected activity

was followed by discriminatory treatment or through evidence of disparate treatment

of employees who engaged in similar conduct . . . .").

To that end, Mogilevsky cites the post-2007 series of disciplinary actions taken against him despite his generally positive annual evaluations.  He also challenges Wellbridge's version of the predicate facts underlying several of the most serious citations.  For example, with regard to the December 2007 stereotyping complaint, Mogilevsky denies saying anything "regarding 'Jewish' body types."  Pl. SOF 33.  He also denies (more or less) calling Cadoux a "bitch" during their February of 2008 altercation.  Pl. SOF ¶ 63.  While Mogilevsky's evidence of retaliation is scant, there is just enough to permit a fact finder to draw the inference that what appears to have been a marked change in Wellbridge's appreciation of Mogilevsky can be traced to resentment at him for his filing of the litigation, a resentment that may have been compounded by the graceless way in which he celebrated its successful (from his perspective) termination.[11]

There is also some support for Mogilevsky in evidence suggesting that after filing the Wage Act litigation, he was treated differently than other trainers.  He cites as an example being disciplined for missing a staff meeting while tending to a client,

---

[11] Murphy and Abella both testified that they learned of the resolution of the 2007 lawsuit when Mogilevsky arrived at the Club one day and announced that he had "won" and was "buying everybody lunch on Wellbridge."  Murphy Dep. at 87; Abella Dep. at 116-117.

while five other staff members who missed the same meeting – "Sean Todd-Geddes; Nasia Nurek; Mike Gradone; Kristina Courage" – suffered no penalty.  Pl. Ex. 26. Mogilevsky notes that Abella oversaw the schedule and knew that Mogilevsky had a client training session but failed to bring the conflict to his attention.  *Id.*  He also points to evidence that he was the only trainer to receive Wellbridge's memo to discontinue non-Club member trainings (Pl. Ex. 27) – and contends as well that no other Cambridge employee was ever subjected to a disciplinary action based solely on a customer's complaint.[12]  Pl. SOF ¶ 38.  As previously remarked, this is pretty thin grist for the litigation mill, but where the issue at bottom comes down to a determination of Wellbridge's "motive and intent," the court's mandate is to defer to the jury as the ultimate finder of fact.  *See Santiago-Ramos*, 217 F.3d at 54.

ORDER

For the foregoing reasons, Wellbridge's motion for summary judgment is DENIED.  The Clerk will assign the case a trial date.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

[12] Abella claimed at his deposition that other Cambridge employees were disciplined because of Club member's complaints, but that he could not remember who or why.  Abella Dep. at 33-34.